IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **MIDTEXAS INDUSTRIAL** | § | |
| **PROPERTIES, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:19-CV-1573-L** |
| | § | |
| **U.S. POLYCO, INC.,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Plaintiff's Motion for Leave to File Amended Complaint (Doc. 19), filed June 2, 2020; Defendant U.S. Polyco, Inc.'s Motion for Summary Judgment (Doc. 23), filed August 17, 2020; and Plaintiff MidTexas Industrial Properties, Inc.'s Motion for Partial Summary Judgment (Doc. 26), filed August 17, 2020.  After considering the motions, briefs, admissible summary judgment evidence, and applicable law, the court **grants** Defendant U.S. Polyco, Inc.'s Motion for Summary Judgment (Doc. 23) with respect to its affirmative defense of lack of consideration; **denies** Plaintiff MidTexas Industrial Properties, Inc.'s Motion for Partial Summary Judgment (Doc. 26); **denies** Plaintiff's June 2, 2020 Motion for Leave to File Amended Complaint (Doc. 19); and **dismisses with prejudice** this action.

## I.    Factual and Procedural Background

On June 28, 2019, MidTexas Industrial Properties, Inc. ("MIP" or "Plaintiff") brought this action against U.S. Polyco, Inc. ("USP" or "Defendant") to recover $499,494.21 for breach of a February 9, 2015 letter agreement, which MIP contends constitutes a valid and enforceable guaranty ("Guaranty") between Jay Mills Contracting, Inc. ("Mills") and USP that was subsequently assigned to MIP.  Plaintiff has moved for summary judgment on its sole claim for

**Memorandum Opinion and Order – Page 1**

breach of the Guaranty, as well as Defendant's affirmative defenses.  Defendant has moved for summary judgment on Plaintiff's  breach of guaranty claim and its affirmative defenses, including its defense that the Guaranty is unenforceable for lack of consideration.  The court determines that that parties' contentions regarding Defendant's lack of consideration defense is dispositive.  The court's analysis, therefore, focuses on this issue. Unless otherwise indicated, the factual matters herein are undisputed.

On July 14, 2014, USP, as "Customer," and Texas Central Business Lines ("TCB"), as "Owner," executed a Railroad Allowance Agreement ("RAA"), for TCB to construct a transload facility for USP in Midlothian, Texas, where USP could take advantage of TCB's railroad service to receive materials and ship products.  Pursuant to the RAA, TCB agreed to construct the transload facility, which would consist of "TCB Infrastructure Improvements," including "certain rail track, roadway and other infrastructure improvements in order to permit [USP] to operate a program of self-transloading of Commodities shipped by rail to or from the TCB Transload Center."  Def.'s App. 7 (Doc. 24).  In exchange, USP agreed in paragraph 2.1 of the RAA to pay a cumulative "maximum amount" or "Maximum Customer Payment" of $1,200,000 for all costs of construction of the TCB Infrastructure Improvements, including "all costs related to work authorized by a change order requested by [USP]."  *Id.* at 10.  TCB agreed to pay in a timely manner any costs that exceeded USP's "Maximum Customer Payment" of $1,200,000.  *Id.*  Paragraph 2.1 of the RAA further provides that payments by USP for construction costs for "[a]mounts approved by Engineer will be advanced or paid by Customer for the benefit of TCB (either by direct payment to the contractor or indirectly by payment to TCB in reimbursement of the substantiated payment by TCB to the contractor of the amount due."  *Id.* at 9.

Paragraph 1.3.2 of the RAA states, regarding the selection of contractors, that the Engineer and Contractors to perform the construction work described in the RAA would be selected by TCB with the "concurrence" of USP.  *Id.* at 8.  The parties agreed that Lone Star Railroad Contractors, Inc. would construct the railroad track portion of the "TCB Infrastructure Improvements."  *Id*. at 8, 92. TCB hired Jay Mills Contracting, Inc. ("Mills") to do the grading work for the "TCB Infrastructure Improvements."

On January 9, 2015, TCB and Mills executed a separate construction agreement ("Mills Agreement") with Mills as Contractor and TCB as Owner, pursuant to which Mills agreed to perform "Site Grading for The Texas Central Business Lines US PolyCo Transload including Truck Transit Drives, Rail Transit & Transfer Tracks 1 & 2, and Transload Storage Area & Truck Transfer Area" in exchange for payment of a base contract price of $947,770.71, which was the same as the amount of the Base Bid price included in Mills' bid proposal dated January 7, 2015. *Id.* at 31.  Paragraph 5.1 of the Mills Agreement requires TCB to make progress payments and a final payment to Mills for "the remainder of the Contract Price as recommended by  Engineer." *Id.* at 32.  Shortly after the Mills Agreement was executed, Mills commenced its work.  *Id.* at 37-37.

Approximately one month later, on February 6, 2015, TCB vice president Jonathan Lorman ("Mr. Lorman"), who is also been licensed to practice law in California since 1968,  sent an e-mail to USP Chief Financial Officer ("CFO") Marvin Small ("Mr. Small") that included as an attachment Mills' Application No. 1 to TCB for payment of $99,630 for grading work performed by Mills and approved by the project Engineer Lunsford Associates, L.C. ("Lunsford").   In his e-mail, Mr. Lorman requested that USP pay Mills directly for work it had performed and also requested that USP sign a "guaranty letter."  *Id.* at 36-37.  In this regard, Mr. Lorman asserted that

paragraph 2 of the RAA, which he referred to as the "RRA," required USP to pay the contractor (Mills) the amounts confirmed by the Engineer and approved by TCB. *Id*. Mr. Lorman further asserted that paragraph 1.3.2 of the RAA required USP "to approve the contractor and amount to be paid for the work." *Id*. at 37. In connection with this assertion, Mr. Lorman also referenced and attached the Mills Agreement to his e-mail.

Mr. Lorman then requested that USP execute the Guaranty attached to his e-mail while implying that doing so was necessary "to evidence and implement the above." *Id.* By this, Mr. Lorman was referring to the payment terms in paragraph 2 of the RAA, but he provided no explanation for why something additional was needed "to evidence and implement" the previously executed RAA or the Mills Agreement, which do not reference a guaranty. He also did not explain why TCB, rather than Mills, was requesting a guaranty to secure its own payment obligations under the Mills Agreement that, according to Mr. Lorman, would have the effect of shifting TCB's payment obligations under the Mills Agreement to USP, at least with respect to the $947,770.71 base contract price.

In this regard, Mr. Lorman indicated that the Guaranty would obligate USP to pay the base contract price ($947,770.71) for the Mills Agreement, which in turn would be applied to USP's $1,200,000 Maximum Customer Payment under the RAA, and that proceeding in this manner was consistent with paragraph 2 of the RAA:

> In order to evidence and implement the above, TCB requests Polyco to sign the attached guaranty letter on letterhead with respect to the Mills contract. The contract price of $947,770 will be applied to the $1,200,000 Maximum Customer Payment of Polyco under RRA, paragraph 2.1, leaving the amount of $252,229.29 for additional contracts. This letter confirms the agreement under Section 2 of the RRA [sic] that Polyco will advance funds for the TCB Infrastructure Improvements by paying the contractor payment requests as approved by the engineer and requested by TCB. After signature, please e[-]mail a pdf of the signed letter to me, and overnight the original and TCB copy to Dave Harlan. He should deliver the original to Toby Mills on-site and the TCB copy to Buddy Reasoner. The Lunsford

> copy can be mailed by regular mail to Rick Lunsford at Arlington address shown
> on the Plan Sheets.

*Id.* Mr. Lorman further requested that Mr. Small handle TCB's request for a guaranty expeditiously

because he was also forwarding Mills' Application No. 1 to USP for payment.

The proposed letter Guaranty drafted by Mr. Lorman and signed by Mr. Small on behalf

of USP on February 9, 2016, states as follows:

> Jay Mills Contracting, Inc.
> P.O. Box 1669
> Stephenville, TX 76401
>
> Attention: Toby Mills, President
>
> Dear Sirs:
>
> With reference to that certain Agreement dated January 9, 2015[,] between
> you and [TCB] for grading of US Polyco Transload at the TCB Transload Center
> in Midlothian, Texas, this will confirm that [USP] guarantees payment (as a
> primary and not as a secondary obligor) of all amounts owed to you for such work
> under the agreement, but not to exceed $947,770.71, and waives any requirement
> for the exhaustion of remedies against TCB as a condition to our obligation to make
> such payments. For such purpose, please provide us at our address indicated hereon
> with a duplicate copy of each request for payment which you make to the project
> engineer [Lunsford]. Upon approval of a request by the engineer, we will make
> timely payment directly to you, and provide a copy of payment to TCB and the
> engineer.
>
> Very truly yours,
>
> U.S. Polyco, Inc.
> A Nevada Corporation
> Marvin Small CFO
>
> Cc: Jon Lorman, [TCB]
> Rick Lunsford, [Lunsford]

*Id.* at 75.

USP paid Applications No. 1 ($99,630), No. 2 ($212,454), and No. 3 ($136,192.50)

submitted by Mills between January 31, 2015, and April 30, 2015, totaling $448,276.50.  USP's

last payment to Mills was made on June 16, 2015. USP contends, and Mr. Small states in an affidavit, that after USP made these payments to Mills and payments to other contractors, it reached its $1.2 Maximum Customer Payment under the RAA.  Def.'s Summ. J. Br. 5 (citing Def.'s App. 92); *see also* Def.'s App. 6 (Small Aff. ¶ 13).

After USP made its third payment to Mills, a dispute arose between USP and TCB as to USP's remaining payment obligations.[1]  Without mentioning the Guaranty, Mr. Lorman states in an affidavit that "USP failed and refused to pay [] Application No. 4 or any subsequent [] applications submitted by TCB to USP *under the Mills Agreement*."  Pl.'s Resp. App. 20 (Doc. 34) (emphasis added).  MIP does not dispute that USP paid Mills' first three applications totaling $448,276.50 or that, after making these payments to Mills and other contractors, USP reached its $1.2 Maximum Customer Payment under the RAA. MIP, instead, contends that, because USP agreed to guarantee up to the $947,770.71 of TCB's payment obligations to Mills under the Mills Agreement, it continues to owe $449,494.21 under the Guaranty, notwithstanding the $1.2 Maximum Customer Payment provision in the RAA that was agreed to by USP and TCB.

---

[1] USP submitted evidence regarding another lawsuit involving it and TCB, but the court determines that this dispute is not relevant to the resolution of USP's affirmative defense based on lack of consideration. The other lawsuit was filed by USP on August 26, 2015, against TCB in the 40th Judicial District Court, Ellis County, Texas ("Ellis County Lawsuit").  That lawsuit resulted in a jury verdict and final judgment in favor of USP on October 5, 2018, and a damages award of $8,699,989, plus attorney's fees and prejudgment interest.  The Final Judgment states that a partial summary judgment in favor of USP was entered on November 14, 2016, "regarding the interpretation of certain contracts in this dispute," but does not identify the contracts or provide any details regarding the claims and issues in dispute.  USP also submitted the Jury Charge entered in the Ellis County Lawsuit.  From this, it is apparent that the Ellis County Lawsuit involved the issue of whether either USP or TCB violated a provision of the RAA (paragraph 1.1(3)) and another related contract (Transload Agreement or TA), which are not relevant to court's resolution of the claims and defenses asserted by USP and MIP in this case. MIP also contends that there is no evidence in this case that the Ellis County Lawsuit involved the Guaranty or the rights and obligations created by the Guaranty. While the claims and defenses in the Ellis County Lawsuit did not directly involve the Guaranty or the rights and obligations created by the Guaranty, there is some evidence in this case that the Guaranty was discussed in depositions and at trial. The court's consideration of evidence pertaining to the Ellis County Lawsuit is, therefore, limited to evidence relied on by the parties in this action regarding the Guaranty, and the parties' contentions as to whether the Guaranty was supported by consideration.

**Memorandum Opinion and Order – Page 6**

During the summer of 2015, after USP made its last payment to Mills on June 16, 2015, Mr. Lorman reached out to L. Randall Denton ("Mr. Denton"), the president of MIP, and MIP affiliate MidTexas International Center, Inc. ("MIC").  Mr. Lorman explained that TCB was not financially able to make the payments under the Mills Agreement and asked Mr. Denton if MIC would take an assignment of the Guaranty and continue to perform under the Guaranty by making payments to Mills as they became due.  *Id.* at 52.  In his deposition, Mr. Denton testified that MIC agreed to take the assignment of the Guaranty from Mills and make payments to Mills. Mr. Denton further testified that it was his understanding that, in taking the assignment, MIC "was stepping in[to] the shoes of [USP] that was to make the payments," and, as a result of MIC's payments to Mills, TCB would have no further payment obligations to Mills or MIC.  *Id.* at 54.  In addition, Mr. Denton testified that it was MIC's expectation that the assignment of the Guaranty gave it the right to seek reimbursement from USP for the amounts it paid to Mills, even though the assignment assigned only the rights Mills had under the Guaranty.  *Id.*

On August 3, 2015, after MIC agreed to take accept the assignment of the Guaranty, TCB project manager Buddy Reasoner ("Mr. Reasoner") e-mailed Mills president Toby Mills ("Mr. Mills") a proposed Assignment of Guaranty, explaining that:

> Toby—As we discussed this morning[,] we need to restructure the payment source to you for the balance of the US Polyco contract work. In the past your payment requests, on approval from TCB thru Lunsford [] have been sent to [USP] for payments.  Starting with your most recent unpaid request[,] TCB has arranged for [MIC] to make payments on approval to you.
>
> Attached find Assignment of Guaranty to be executed by you to [MIC] in order for them [to] hold Guaranty for [USP] repayment. To move this forward[,] please print 3 copies of the Assignment, sign all 3 and send them overnight to my attention[.]

*Id.* at 13.

Mills executed the Assignment of Guaranty on the same date. Pursuant to the Assignment of Guaranty, Mills assigned all of its rights under the Guaranty to MIC.  *Id*. at 14.  Instead of seeking payment from USP under the Guaranty for amounts TCB owed to Mills, MIC paid Mills' Application Nos. 4 through 9, except for Application No. 7, which was paid by TCB.  A summary of the payments made by MIC is as follows:

| Mills Applications | MIC Payments | Payment Dates |
|---|---|---|
| 4 and 5 | $144,835 | August 3, 2015 |
| 6 | $67,829.85 | September 1, 2015 |
| 8 | $309,598.37 | September 22, 2016 |
| 9 | $112,143.73 | September 22, 2016 |

On November 28, 2018, after making the final payment to Mills, MIC assigned all of its rights under the Guaranty to MIP.

MIP filed this action against USP several months later on June 28, 2019, for breach of the Guaranty, asserting that, as a result of the two assignments, it is the "owner and obligee under the Guaranty and entitled to exercise all of the rights and remedies and to collect all amounts due from [USP] under the Guaranty" given USP's breach of the Guaranty when it "failed to pay when due the amounts required to be paid to Mills and in turn [MIP.]"  Pl.'s Compl. ¶¶ 10-11.  The next day, MIP, through its counsel and as Mills' assignee under the Guaranty, sent USP a written demand for payment under the Guaranty in the amount of $449,770.71.  Prior to this action being filed, USP was not aware that Mills had assigned its interest under the Guaranty or that MIC had made payments to Mills.  Def.'s App. 6 (Small Aff. ¶¶ 14-15). MIP's demand letter, nevertheless, asserts that it is entitled to three percent interest on the unpaid debt owed by USP under the Guaranty in accordance with Article 6 of the Mills Agreement of which neither USP nor MIP are parties.

On January 13, 2020, the court denied without prejudice USP's motion, which was opposed by MIP, to add TCB as a third-party defendant to this case after expiration of the deadline to join parties.  Six months later, on June 2, 2020, MIP moved for leave to amend its Complaint, after expiration of the December 4, 2019 deadline for amendment of pleadings, to add a claim against USP for trespass and nuisance as a result of its alleged failure to remove a metal building, storage tanks, and other equipment that were constructed on the premises operated and leased by MIP ("Premises").  MIP contends that, pursuant to USP's agreements with TCB, USP has no right or interest in any portion of the Premises after it terminated its agreements with TCB on August 15, 2016, and after TCB's license to use the Premises expired.  According to MIP, USP was obligated at its expense to remove the structures from the Premises and repair any damage to the Premises. The motion is opposed by USP.

Thereafter, both parties filed their respective summary judgment motions on August 17, 2020, which were ripe as of September 22, 2020.  The parties' briefs devote a lot of attention to the issue of whether MIP's voluntary payments to Mills released TCB from any further obligations under the Mills Agreement, and, in turn, extinguished USP's obligation under the Guaranty to pay all amounts owed by TCB to Mills under the Mills Agreement up to $947,770.71. The court, however, need not address this issue because, for the reasons herein explained, it concludes that USP is entitled to judgment on its affirmative defense that the Guaranty is unenforceable for want of consideration.  For the same reason, the court does not address the numerous other arguments raised by the parties that do not pertain to this issue.

## II.    Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions,

improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23. "Whe[n], as here, parties have filed cross-motions for summary judgment, each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Engr's, Inc*., 395 F.3d 533, 538-39 (5th Cir. 2004).

## III.    USP's Motion for Summary Judgment

USP moves for summary judgment on its affirmative defense of lack of consideration, contending that the Guaranty signed by Mr. Small on February 9, 2015, on behalf of USP, is not enforceable against USP because it is not supported by consideration separate from that supporting the Mills Agreement.

### A.      Consideration Required for a Guaranty Under Texas Law

A "guaranty" is a contract that involves "an undertaking by one person to be answerable for the payment of some debt or the performance of some contract or duty by another person, who himself remains liable." *Wells Fargo Bank, N.A. v. Smuck*, 407 S.W.3d 830, 835 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing *Wood v. Canfield Paper Co*., 5 S.W.2d 748, 749 (1928)).  The existence of a valid guaranty is a prerequisite to recover for breach of a guaranty. *Gold's Gym Franchising LLC v. Brewer*, 400 S.W.3d 156, 160 (Tex. App.—Dallas 2013, no pet.) (citation omitted).  To be valid, a guaranty must be supported by consideration. *Fourticq v. Fireman's Fund Ins. Co.*, 679 S.W.2d 562, 564 (Tex. App.—Dallas 1984, no writ) (citation omitted).  Texas law, however, presumes that a written contract is supported by consideration, such that the burden of proving otherwise is on the party asserting a failure of consideration. *Gooch v. American Sling Co*., 902 S.W.2d 181, 185 (Tex. App.—Fort Worth 1995, no writ).

"Consideration for a guaranty agreement usually consists of either the sufferance of a detriment by the creditor or a benefit conferred on the primary debtor."  *Id*. (citation omitted).  If a "guaranty is entered into independently of the transaction which created the primary debt or obligation, the guarantor's promise must be supported by consideration distinct from that of the primary debt." *Id.* (citation omitted). As explained by the Texas Supreme Court, however, "[d]etermining whether a guaranty agreement is independent of the debt it guarantees . . . is not simply a question of the order in which the documents are signed" because, "even when the guaranty is signed after the principal obligation, 'the guaranty promise is founded upon a consideration if the promise was given as the result of previous arrangement, the principal obligation having been induced by or created on the faith of the guaranty.'" *First Commerce Bank v. Palmer*, 226 S.W.3d 396, 398 (Tex. 2007) (citing *Universal Metals & Mach., Inc. v. Bohart*,

539 S.W.2d 874, 878 (Tex. 1976)) (other citation and footnote omitted).  Thus, when "the guarantor's promise is given as part of the transaction that creates the guaranteed debt, the consideration for the debt likewise supports the guaranty," *First Commerce Bank*, 226 S.W.3d at 398, and evidence regarding the timing of the execution of the guarantee succeeding the original transaction is insufficient alone to establish that the guarantee is not supported by consideration. *Maykus v. Tex. Bank & Tr. Co. of Dallas*, 550 S.W.2d 396, 398 (Tex. Civ. App.—Dallas 1977, no writ).

As the party seeking summary judgment on an affirmative defense, USP has the initial burden of establishing the defense beyond dispute before the burden shifts to MIP to come forward with evidence to show that there is a genuine issue of fact. *See Fontenot*, 780 F.2d at 1194.

**B.      USP's Arguments and Evidence Regarding Consideration for teh Guaranty**

USP argues that separate or additional consideration was required but does not exist because the Guaranty was not entered into as part of the Mills Agreement; was not contemplated or discussed by USP, Mills, or TCB when the RAA and Mills Agreement were executed; and there is no additional indebtedness supporting the subsequent Guaranty because the based contract price for the Mills Agreement is identical to the amount of the Guaranty.  USP notes that the Guaranty was executed separately and approximately one month after Mills and TCB executed the Mills Agreement.  USP also relies on the plain language of the RAA and Mills Agreement, asserting that neither expressly recites consideration; neither of the agreements or the documents that make up the agreements references a guaranty or the need for one; and both agreements include integration clauses that negate the existence of any prior discussions or oral agreements. USP further asserts that the Guaranty itself does not say that it is being requested in accordance with any prior

discussions or indicate that Mills ever requested USP to guarantee TCB's payments in the event

TCB defaulted on its payment obligations under the Mills Agreement.

In addition, USP contends that the parties' conduct further demonstrates that the Guaranty

did not induce Mills' performance under the Mills Agreement:

> It is clear that Mills was the go-to contractor at the location and had been used by
> MidTexas and TCB on many projects. App. p. 53. More telling is that Mills
> executed the Mills Agreement on January 9, 2015[,]and immediately went to work
> without a guaranty. App. p. 31 – 35, 38 - 40. There is no evidence that Mills ever
> talked to TCB or USP about a guaranty. App. p. 5 - 6. Mills completed more than
> 10% of the work at a cost of $127,530.20 before a guaranty was even mentioned to
> USP. App. p. 6, 31 – 35, 38 - 40. And, when a guaranty was brought up[,] it was
> from TCB, the company obligated to pay Mills, which was apparently financially
> unable to pay Mills. App. p. 5 – 6, 52. It is clear, therefore, that the Mills Agreement
> to perform grading work was not created or induced by a guaranty from USP.

Def.'s Summ. J. Brief 12.  USP argues that, "[i]f Mills required the 'guaranty' and would not

perform without it, [this] would have been expressed by Jon Lorman in the e[-]mail forwarding

the guaranty [to Mr. Small], but it was not."  *Id.* at 13 (citing Def.'s App. 36-37).  USP further

asserts that there is also no evidence that, without a guaranty from USP, Mills would have refused

to continue performing the work it was obligated to perform under the Mills Agreement because

it is clear from Mr. Denton's deposition testimony that Mills had done work in the past for MIC

and TCB without the need for a guaranty.

USP also points to Mr. Denton's deposition testimony, who was unaware whether a

guaranty from USP was contemplated at the time the Mills Agreement was executed, and the

testimony of Mr. Small, who states in his affidavit:

> 7. USP played no role in negotiating the Mills Agreement and was not a party to
> the Mills Agreement. USP was not present when the Mills Agreement was
> executed. The Mills Agreement does not contain any references to a guaranty, and
> the contract documents do not include a guaranty. No one required or even
> mentioned a guaranty to USP until February 2015. The [RAA] and the [TA] do not
> require a guaranty from USP for work performed by Mills.

8. Jon Lorman contacted me on February 6, 2015 by e[-]mail and demanded that USP execute a guaranty document related to the Mills Agreement. Prior to that e[-]mail[,] neither TCB nor Lorman had ever mentioned a guaranty in relation to the Mills Agreement. A true and correct copy of Lorman's February 6, 2015 e[-]mail is attached hereto as Exhibit D.

9. Mills never demanded a guaranty from USP, and never contacted USP concerning a guaranty.

10. Neither Mills nor TCB offered anything of material value to induce USP to execute the guaranty document provided by TCB. No changes were made to the Mills Agreement, and it was not modified in any way to obtain the executed guaranty document.

11. By the time Jon Lorman requested that USP execute the guaranty document he prepared related to the Mills Agreement, Mills had performed a substantial amount of work on the project. The payment application (No. 1) submitted to me in February 2015 showed that the work performed by Mills to that point was valued in excess of $127,000.00. A true and correct copy of Application for Payment No. 1 is attached hereto as Exhibit E.

12. Neither I nor anyone else at USP played any role in drafting the guaranty document which Jon Lorman and TCB demanded that USP execute.

Def.'s App. 5-6.

USP contends that all of the foregoing evidence establishes that the Guaranty was not contemplated when the Mills Agreement was executed and conclusively negates the existence of additional consideration supporting the Guaranty, such that there can be no breach of the Guaranty because it is not enforceable absent additional consideration. USP further contends that MIP has no evidence to establish otherwise, and, at most, can only offer inadmissible hearsay and conclusory statements.

### C.      Sufficiency of USP's Evidence Regarding Lack of Consideration

The court agrees that this evidence is sufficient to satisfy USP's burden of showing that additional consideration was required to support the Guaranty because it was not contemplated when the Mills Agreement was executed or prior to this time, and it was not required by Mills as

a condition to perform the work it agreed to do under Mills Agreement.  Thus, the Guaranty is independent of the debt under the Mills Agreement (TCB's payment obligations) that it guarantees. *See First Commerce Bank*, 226 S.W.3d at 398.  Additionally, USP did not guarantee indebtedness for which TCB was not already liable under the Mills Agreement, so there was no new benefit or incentive for Mills or TCB to perform their respective obligations under the RAA and Mills Agreement that they were not already required to perform as a result of these agreements.  In short, USP's evidence establishes that the Guaranty did not alter the parties' rights or obligations under the Mills Agreement or the RAA, except that, upon executing the Guaranty, USP had to guarantee TCB's payment obligations under the Mills Agreement if it failed to pay Mills as agreed under the Mills Agreement.  *See Fourticq*, 679 S.W.2d at 564. Thus, the burden shifts to MIP to rebut USP's evidence to raise a genuine dispute of material fact regarding the sufficiency of the consideration supporting the Guaranty.

### D.    MIP's Arguments and Evidence Regarding Consideration for the Guaranty

MIP contends that no separate or additional consideration was required for the Guaranty because, contrary to USP's assertion, the Guaranty was contemplated by TCB and USP and discussed in 2014 when TCB and USP met regarding the transload facility project, prior to executing the RAA.  For support, MIP relies on the testimony of Mr. Lorman, Mr. Mills, and USP president Thomas B. Nichols ("Mr. Nichols") and contends that this evidence is sufficient to raise a genuine dispute of material fact.

#### 1.    *Mr. Lorman's Affidavit*

In an affidavit, Mr. Lorman states as follows with respect to TCB's and USP's discussions regarding the RAA and consideration for the Guaranty:

> 3. In the late spring or early summer of 2014, on behalf of TCB, I entered into discussions with Tom Nichols, the owner of [USP], regarding providing rail

services and the construction of a transload facility on a portion of the 250 Acres (the "USP Transload") [that] would be used by USP for the receipt of asphalt materials by rail, the transloading and storage of such materials, and the shipping of such materials to USP's customers by truck. In the late spring or early summer of 2014, 1 traveled to Reno, Nevada[,] to meet with Tom Nichols. At a dinner with Tom Nichols during that trip, Mr. Nichols and I discussed the construction of the USP Transload. That construction consisted of both plant and infrastructure improvements. . . . Although USP would be the beneficiary of the TCB Infrastructure Improvements and would be responsible for the payment of a substantial portion of the cost of those improvements (with TCB paying the rest), TCB would be the owner of the TCB Infrastructure Improvements and TCB would have authority to engage the engineers and contractors and to control the construction process. In return, USP would be able to recoup its payment for the infrastructure costs by receiving payments or credits from TCB based on the rail car business for TCB provided by USP rail shipments over a defined period of time to the USP Transload. Mr. Nichols and I specifically discussed the construction contracts for the TCB Infrastructure Improvements and the need for TCB to enter into those contracts with the contractors so that TCB could control the work. **Mr. Nichols and I also discussed that[,] because USP would be responsible for paying for the work, USP, if requested by TCB, would be required to execute a guaranty of the payment obligations of TCB under those construction contracts up to a set limit. I specifically recall using the term "guaranty," and that Mr. Nichols agreed, on behalf of USP, that USP would sign a guaranty for any construction contract for the TCB Infrastructure Improvements up to the agreed upon limit.**

4. At Mr. Nichol's request, my remaining discussions with regard to the providing of rail services to USP and construction of the USP Transload infrastructure were in connection with negotiations with Marvin Small, the [CFO] of USP, of two agreements relating to these matters. **My discussions with Mr. Small were consistent with my discussions with Mr. Nichols, including the need for a guaranty from USP to provide TCB with an assurance that USP would pay for the work performed pursuant to construction contracts between TCB and contractors up to the agreed upon limit. I recall using the term "guaranty" in my discussions with Mr. Small, and Mr. Small agreeing to USP providing a guaranty.**

5. Attached hereto as Exhibit "A- is a true and correct copy of [the RAA] dated July 14, 2014, by and between TCB and USP []. Section 2. 1 of the RAA obligates USP to pay for up to $1,200,000.00 for the TCB Infrastructure Improvements (as that term is defined in the RAA). [Mills] was engaged to perform site work and site grading work for the USP Transload. The base price for that work was $947,770.71. **Given the cost of the work to be performed by Mills, TCB's lack of experience with USP, and TCB's concerns with USP's performance of its payment obligations for TCB Infrastructure Improvements, TCB required that USP execute a guaranty of TCB's obligations under TCB's construction**

**agreement with Mills up to the full amount of the $947,770.71 base price.**
Attached hereto as Exhibit "A-2" is a true and correct copy (without exhibits) of the Agreement dated January 9, 2015, by and between TCB, as Owner, and Mills, as Contractor, with respect to the work to be performed by Mills in connection with the USP Transload for a base price of $947,770.71 (the "Mills Agreement"). Attached hereto as Exhibit "A-3" is a true and correct copy of an e[-]mail dated February 6, 2015, which I sent to Marvin Small of USP regarding a guaranty to be signed by USP in connection with the Mills Agreement. Consistent with the Mills Agreement, the guaranty by USP capped the liability of US.P at $947,770.71, the base price of the Mills Agreement. In the e[-]mail, I instructed Mr. Small to sign the guaranty, to e[-]mail the signed guaranty to me and to deliver the original to Dave Harlan, who would in turn deliver the original to Toby Mills on behalf of Mills. Attached hereto as Exhibit "A-4" is a true and correct copy of an e[-]mail dated February 10, 2015, which I received from Marvin Small together with a signed copy of a letter agreement dated February 9, 2015, pursuant to which USP guaranteed the payment obligations of TCB under the Mills Agreement up to $947,770.71 (the "Guaranty"). . . .

6. **Although the Guaranty was agreed to prior to the execution of the Mills Agreement and contemplated at the time of the Mills Agreement**, the Guaranty was not signed until February 9, 2015. The interval of time between the date of the Mills Agreement and the date of the Guaranty was the result of USP pushing to start construction as soon as possible and my lack of time to give my undivided attention and priority to having the Guaranty executed. Both USP's agreement to guarantee TCB's obligations under the Mills Agreement and TCB's requirement that USP execute a guaranty of the Mills Agreement existed on and before the January 9, 2015 date of the Mills Agreement. **TCB would not have signed the Mills Agreement or authorized Mills to commence work without USP's prior commitment and agreement to guarantee the payment of the amounts charged by Mills under the Mills Agreement.**

Pl.'s Resp. App. 17-20 (emphasis added).

USP objects to paragraphs 3, 4, 5, and 6 of Mr. Lorman's affidavit on the ground that the testimony in these paragraphs regarding conversations with USP about the Guaranty constitutes hearsay that is not subject to an exception and, thus, not competent summary judgment evidence. In addition, USP contends that the integration clause in the RAA prevents the introduction of parol evidence in the form of statements pertaining to negotiations or discussions regarding additional obligations that are not included in the RAA that would vary the written terms of the RAA. Finally, USP argues that Mr. Lorman's affidavit testimony regarding the origin and basis for the Guaranty

should not be considered under the "sham doctrine" because it conflicts with the testimony he previously gave under oath at the jury trial in the Ellis County Lawsuit during which he testified that the Guaranty is contained in the RAA.

When parties "have a valid, integrated written agreement," the parol evidence rule "precludes enforcement of prior or contemporaneous agreements." *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (citations and footnote omitted). If a court concludes that a contract is unambiguous, it may still consider the surrounding "facts and circumstances," but only as "an aid in the construction of the contract's language." *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). In other words, the parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Expl.*, 352 S.W.3d at 469. Extrinsic evidence, however, "cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated." *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, PC*, 352 S.W.3d 445, 451 (Tex. 2011).

Proffered evidence in a summary judgment motion need not be in admissible form, but its content must be admissible. *See Celotex Corp.*, 477 U.S. at 324. Under the Federal Rules of Evidence, hearsay, defined as any statement not made by a person while testifying in the current trial or hearing and that is offered to prove the truth of the matter asserted, is inadmissible. Fed. R. Evid. 801, 802. Mr. Lorman's statements regarding his prior discussions with Mr. Nichols and Mr. Small concerning the need for a guaranty are hearsay, as they are offered for the truth of the matter asserted to show that, prior to the execution of the RAA and Mills Agreement, TCB and USP contemplated, discussed, and agreed that USP would provide a guaranty if requested by TCB. Rules 803 and 804 set forth exceptions that make statements subject to the hearsay rule admissible,

but none of these exceptions apply here. Rule 807, the "Residual Exception," provides that, even if not admissible under Rules 803 or 804, this exception to the hearsay rule applies, upon reasonable notice to the opposing party, if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a)(1)-(2).

Given Mr. Lorman's role in bringing about the Guaranty and subsequent assignments in an effort to protect TCB from financial liability; the Ellis County Lawsuit involving TCB and USP; and Mr. Lorman's conflicting testimony during the trial of that case, he cannot be considered a neutral witness with nothing to gain from the outcome of this litigation. Accordingly, considering the totality of the circumstances, his hearsay statements are not supported by sufficient guarantees of trustworthiness and, thus, not excepted from the hearsay rule under Rule 807.

The court also agrees that Mr. Lorman's testimony that the parties' alleged agreement for USP to execute a guaranty derives from prior discussions and an oral agreement directly conflicts, without explanation, with his deposition testimony in the Ellis County Lawsuit that the parties' agreement to execute the Guaranty is contained in the RAA. In addition, Mr. Lorman testified in the jury trial of that same case that the Guaranty was to provide *Mills, the contractor with assurance* that it would get paid for the work it performed under the Mills Agreement, whereas he states in his affidavit in this case that "the need for a guaranty from USP [was] *to provide TCB with an assurance* that USP would pay for the work performed" as required under the RAA. Pl.'s Resp. App. 18. *See generally S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996); *Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 247 (N.D. Tex. 2011) (Under

the "sham affidavit" doctrine, a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit [that] contradicts, without explanation, his previous testimony.") (citations omitted).   The court, therefore, **sustains** UPS's objection to the hearsay and conflicting statements in Mr. Lorman's affidavit, and does not consider them in ruling on the parties' motions.  Moreover, as MIP did not respond to this objection, the issue is **waived**.

USP further argues, and the court agrees, that Mr. Lorman's statement that—"TCB would not have signed the Mills Agreement or authorized Mills to commence work without USP's prior commitment and agreement to guarantee the payment of the amounts charged by Mills under the Mills Agreement"—is of no consequence because TCB had no choice but to enter into the Mills Agreement, as failure by it to hire Mills or another contractor to perform the infrastructure construction work under the RAA would have amounted to a breach of the RAA by TCB.  Def.'s Reply 4.  If TCB had concerns about whether USP would perform its payment obligation under the RAA, TCB could have required USP, or someone on its behalf, to provide a guaranty in connection with the RAA, which was drafted by Mr. Lorman, rather than attempting after-the-fact to obtain a guaranty for TCB's own payment obligations under the Mills Agreement under the guise that it was to provide assurance to Mills when there is no evidence that Mills ever expressed any concern about getting paid for the work it performed in connection with the Mills Agreement.

### 2.   *Mr. Mills' Affidavit*

Mr. Mills states in pertinent part in paragraph two of his affidavit as follows:

At the time Mills commenced work in connection with the USP Transload, Mills **understood** that the work would be performed at the direction of TCB, but that payments for the work would be made to Mills by [USP]. Attached hereto as Exhibit "B-1" is a true and correct copy of the Agreement . . . , dated January 9, 2015, by and between TCB, as Owner, and Mills, as Contractor, with regard to the work to be performed by Mills for the USP Transload project for a base price of $947,770.71 (the "Mills Agreement"). Attached hereto as Exhibit "B-2" is a true and correct copy of a letter agreement dated February 9, 2015, addressed to me on

behalf of Mills, signed by USP and pursuant to which USP guaranteed to Mills the payment obligations of TCB under the Mills Agreement (the "Guaranty"). The Guaranty which was delivered to me is consistent with the arrangements between TCB, Mills and USP as I **understood** them as of the date of the Mills Agreement.

Pl.'s Resp. App. 3-4 (emphasis added).

USP objects to the foregoing testimony by Mr. Mills, contending that it should be stricken and not considered in ruling on the parties' motions because "[Mr.] Mills states his 'understanding' of the alleged guaranty without support for that 'understanding.' It is presumed to be based on hearsay, but regardless, without support it is conclusory and not competent summary judgment evidence." Def.'s Reply 3.

The court **sustains** the objection by USP to Mr. Mills' testimony.  Mr. Mills statement that his company "*understood* that the work would be performed at the direction of TCB, but that payments for the work would be made to Mills by [USP]"[2] conflicts and is inconsistent with the unambiguous language in paragraph 5.1 of the Mills Agreement, which requires TCB to make progress payments and a final payment to Mills for "the remainder of the Contract Price as recommended by  Engineer," and Mr. Mills does not explain the basis for his company's contrary understanding. Def.'s App. 32.  Similarly, Mr. Mills does not explain the basis for his conclusory testimony that the "[t]he Guaranty . . .  is consistent with the arrangements between TCB, Mills and USP *as I understood them* as of the date of the Mills Agreement." As before, this is an improper attempt to inject parol evidence regarding the intentions of the parties to the RAA and Mills Agreement, although these agreements are unambiguous and do not reference or require USP to guarantee TCB's payment obligations under the Mills Agreement.

Regardless, even if admissible, the foregoing testimony by Mr. Mills is too conclusory and insufficiently specific to support MIP's argument that the Guaranty was contemplated,

---

[2]  *Id.*

**Memorandum Opinion and Order – Page 22**

"discussed[,] and agreed to by USP prior to execution of the Mills Agreement and the commencement of work by Mills" under that contract.  Pl.'s Resp. 9.  As with USP's other evidentiary objections, MIP did not respond, so this issue is **waived**.

>    *3.    Mr. Nichols' Deposition Testimony*

When deposed in connection with the Ellis County Lawsuit, Mr. Nichols was shown a copy of the February 9, 2015 Guaranty and asked if he was "*aware that this was entered into at the— at the time in February of 2015*," to which he responded: "Not the exact of what it said, but, yes, I was aware of it."  Pl.'s Resp. App. 71 (emphasis added).  In response to the follow-up question— "You were generally aware that U.S. Polyco was going to guarant[ee] the payment of the Mills contract? — he responded, "Yes."  *Id.*

USP objects to this evidence and contends that the court should not consider it in ruling on the parties' motions because:

>    Tom Nichols is the President/CEO of USP. He has a home and businesses located in Texas. He attended the mediation of this case at the Dallas office of Plaintiff[']s counsel. He is not 'unavailable' per federal law, and his deposition was never requested by Plaintiff. [Mr.] Nichols' deposition from another case is hearsay, and not admissible as summary judgment evidence to defeat USP's motion for summary judgment.

Def.'s Reply. 3.

MIP did not respond to this objection by USP but does state in its response to USP's summary judgment motion that, "[a]lthough the deposition was taken in a prior state court case in which USP was a party, Rule 32 of the Federal Rules of Civil Procedure permits the use of the deposition in this proceeding in part because [Mr.] Nichols is unavailable. (App. p. 70; Nichols Depo. p. 7, l. 1-16)."  Pl.'s Resp. 9 & n.5.

Assuming, without deciding, that Mr. Nichols' deposition testimony in the prior action between TCB and USP is admissible, it is insufficient to raise a genuine dispute of material fact

as to whether the Guaranty was contemplated, "discussed[,] and agreed to by USP prior to execution of the Mills Agreement and the commencement of work by Mills" under that contract. Pl.'s Resp. 9.   At most, his testimony shows that he was generally aware, *as of the time the Guaranty was executed in February 2015*, that USP was going to guarantee TCB's payments under the Mills Agreement.  Accordingly, the court **overrules as moot** USP's objection to Mr. Nichols' deposition testimony.

## IV.     MIP's Motion for Summary Judgment

As noted, MIP moved for summary judgment on its breach of Guaranty claim and USP's affirmative defenses, including USP's defense that the Guaranty is unenforceable for want to consideration.  Having determined that USP is entitled to judgment as a matter of law on its affirmative defense that the Guaranty fails for lack of consideration, the court will deny MIP's Motion for Partial Summary Judgment (Doc. 26) on its breach of Guaranty claim and USP's affirmative defenses, as any other result would be inconsistent with the rulings already made.

Further, MIP's arguments regarding subrogation do not affect the court's ruling as to either of the parties' summary judgment motions.  In an attempt to side-step some of the issues raised by USP regarding its breach of Guaranty claim in which MIP is seeking reimbursement for payments it made to Mills pursuant to the assignment it received of Mills' rights under the Guaranty, MIP characterizes its claim for breach of the Guaranty as one based on the "sale" or "purchase" of debt or an obligation and contends that USP was not released from its payment obligation under the Guaranty as a result of MIP's payments because it is entitled to be subrogated to the rights of Mills against USP.  Def.'s Reply 4. In response to USP's summary judgment motion, MIP similarly argues: "Here, there was an agreement for assignment and subrogation," and equitable subrogation applies when a third-party pays a debt at the request of one of the debtors.  *See* Def.'s Resp. 13-14

& n.6.  MIP's Complaint, however, asserts only a cause of action for breach of the Guaranty based on the assignment MIP received from MIC, which in turn received an assignment of the Guaranty from Mills.  MIP's Complaint, the live pleading, contains no cause of action for equitable subrogation based on an alleged sale or purchase of debt or an obligation.  Accordingly, no such claim is before the court.

## V.       MIP's Motion for Leave to File Amended Complaint

As noted, MIP has requested leave to file an amended pleading. As a result of the court's determination that the Guaranty is unenforceable for want to consideration, MIP's sole claim for breach of the Guaranty will be dismissed with prejudice.  The motion for leave was not filed until June 2, 2020, six months after the deadline to amend pleadings or add parties, *see* Doc. 9 ¶ 2, which set December 4, 2019, as the deadline.  Moreover, MIP has not established diligence or good cause under Federal Rule of Civil Procedure 16(b)[3] to amend its pleadings at this *late* juncture after expiration of the deadline for amendment of pleadings for purposes of adding *new claims* for trespass and nuisance that would require application of different legal requirements and proof of facts different from those supporting the claims and defenses in the parties' live pleadings. The court will, therefore, deny MIP's Motion for Leave to File Amended Complaint (Doc. 19).

---

[3] Before the court can modify a scheduling order and grant leave to amend a pleading under Rule 15(a) of the Federal Rules of Civil Procedure, the movant must first show "good cause" for failure to meet the scheduling order deadline under Rule 16(b).  *S & W Enters., L.L.C. v. Southwest Bank of Alabama*, 315 F.3d 533, 536 (5th Cir. 2003) ("Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired.").  A scheduling order "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b).  The good cause standard requires the "party seeking relief to show that the deadlines [could not] reasonably be met despite the diligence of the party needing the extension."  *S & W Enters. L.L.C.*, 315 F.3d at 535 (citation omitted).  "Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply to the district court's decision to grant or deny leave."  *Id.* at 536.  In deciding whether to allow an untimely amendment, a court considers "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice."  *Id.* (internal quotation marks, brackets, and citations omitted).

VI.     **Conclusion**

For the reasons explained, USP is entitled to judgment as a matter of law on its affirmative defense of lack of consideration. Accordingly, the court **grants** Defendant U.S. Polyco, Inc.'s Motion for Summary Judgment (Doc. 23) with respect to its affirmative defense of lack of consideration; **denies** Plaintiff MidTexas Industrial Properties, Inc.'s Motion for Partial Summary Judgment (Doc. 26); **denies** Plaintiff's Motion for Leave to File Amended Complaint (Doc. 19); and **dismisses with prejudice** this action and MIP's sole claim for breach of the Guaranty. In accordance with Rule 58 of the Federal Rules of Civil Procedure, judgment will issue by separate document.

**It is so ordered** this 30th day of March, 2021.

Sam A. Lindsay
United States District Judge